Good morning, Your Honors, and may it please the Court, Corinne Fierro on behalf of Petitioner. At this time, I'd like to reserve three minutes for rebuttal. And you're Corinne Fierro, you said? Yes, Your Honor. Okay, thank you. How much for rebuttal? I'm sorry. Three minutes. All right. Go ahead. Your Honors, this decision is clouded by an adverse credibility determination that was based entirely on speculation and not supported by the record. But if you remove that cloud, the record is clear and it is filled with evidence in support of deferral of removal under CAT. Now the IJ based his adverse credibility determination on the fact that he didn't believe three things from Felipe's story. He doesn't believe that Felipe has schizophrenia. He doesn't believe that Felipe was injured in Mexico, and he doesn't believe Felipe's story about Dragon. But let's look at what the record says. Did you even challenge the adverse credibility in front of the BIA? Yes, Your Honor, Felipe did challenge the adverse credibility determination at multiple instances in front of the BIA, not only in his opening brief, but in his supplemental motion to remand as well. Because it seems to me you have an issue that you may not have exhausted that. Your Honor, the government has made much of the fact, the claimed fact, that Felipe has not exhausted his arguments. But Felipe put the court on notice on several occasions of these very arguments. Now this is a little bit of a unique case procedurally. So Felipe initially appealed and then remanded because there was an incomplete record due to an error in transcribing. But then he also filed a supplemental motion to remand stating that the IJ failed to consider evidence and also failed to give Felipe notice of any inconsistencies. Now the BIA acknowledged that and remanded with instructions for the IJ to consider this additional evidence, which the IJ did not do, and instead certified it back up to the BIA with a complete record but without addressing this additional evidence. So where, can you point me to the record where you made these arguments, the adverse credibility arguments before the BIA? Can you point me on the record to that place? Yes, Your Honor. So the brief on appeal discusses this at record page 26. And then the supplemental motion to remand filed with the BIA was also at 723 through 25. Do you have any other questions? No. So what's only required is to give the BIA even a scant reference to the arguments and Felipe did far more than that. And he's also maintained it on his opening brief to this Court as well. It seems like you wanted to jump right to Kat, same we should do, go right to Kat, but is that because you know you don't have a very good argument on the carjacking as a serious crime? No, Your Honor. This Court can grant the remedy for Kat and that is why we've argued it first. You know, this record supports an instruction for a deferral of removal under Kat. And this Court can remand with instructions to grant deferral of removal under Kat. So as a practical matter, in remedies speaking, that is the simplest remedy for Felipe and for this Court in this case. The particularly serious crime... If we talk about Kat relief, do you agree, and we have to consider the adverse, if we have to consider the adverse credibility, do you agree that we are limited to reviewing the three findings outlined by the BIA? No, Your Honor, I don't. Because in cases like this where the BIA's conclusions are cursory and clearly very reliant on the IJ's decision, we also need to look at the IJ's decision to understand... The IJ had five reasons and so then the BIA went down to three. Correct, Your Honor, but the BIA also adopted the IJ's findings full sail and cited the IJ's reasoning in its analysis and said that the adverse credibility determination by the IJ was not error and for the reasons stated in the opinion, it was correct. But the BIA only said three of the reasons were good, right? So that's different than what the IJ said. Am I reading the record wrong? Well, Your Honor, in a situation like this one where the BIA's analysis is not entirely independent and it's not entirely complete, we need to look at the IJ's decision in informing the BIA's decision as well because the BIA not only named specific reasons that the IJ also relied on, but it argued and reasoned that the IJ's decision was sound in general and it adopted it. To cut to the chase though, apart from these alleged discrepancies in the gang relationship, the tattoos, etc., the BIA also says we also affirm because we don't have evidence that the Mexican government would be likely to acquiesce in torture and then they have cited reasons for that. Wouldn't that alone undermine and negate the claim? Well, Your Honor, the BIA is incorrect in that assessment. That's a second argument. The question is if the BIA is correct and if there isn't sufficient evidence of the Wouldn't that, in effect, be an independent basis for upholding the determination on CAT? Well, it would be an independent basis in theory, but that's not the torture that Felipe suffered or is likely to suffer. Felipe suffered torture at the hands of the Mexican government, not its gangs that it's making efforts to reduce or control. Mexican police were the individuals who harassed Felipe on countless occasions on the street. They beat him up. They took his money. They locked him in prison for 36 hours, tied to his cell bars without a toilet or food or water. And also, Felipe was targeted by a corrupt police officer who beat him himself and then sent a group of men to beat Felipe within an inch of his life. I mean, Felipe was in a coma for three days and he still can't hear out of his right ear as a result. So, quite frankly, that reasoning is a non sequitur by the BIA. And it's also an example of the IJ's distorted reasoning in this case because the IJ ignored clear evidence in the record, first and foremost, that Felipe is a diagnosed paranoid schizophrenic three times over. And two of those diagnoses were from ICE doctors. And that makes even less sense when you consider his competency hearing finding where he observed that Felipe was having auditory and visual hallucinations to the point that he couldn't explain who he was or the significance of the hearing. And also, the IJ ignored the fact that Felipe's injuries at the hands of Dragon's Henchmen were corroborated by an American hospital where they did scans and showed that Felipe had three different facial fractures as a result of a beating from a baseball bat. Now, that record is significant because it not only confirms that Felipe has been telling the same story about his injuries, that he was beaten with a baseball bat, but it also proves that he was injured. And also, the fact that Felipe could not produce records from Mexico for his treatment is not illogical as the IJ suggested. Instead, Felipe arrived to the hospital in a coma. He was in a coma for three days, and he was promptly released after he didn't have insurance information with three skull fractures at the onset of his schizophrenia. Now, Felipe believed he received treatment at a certain hospital, but his memory was significantly impaired at that point. As Dr. Brookholm testified, Felipe's periods of psychosis do not permit him to have an accurate perception of reality, and his memory during his psychotic episodes is significantly diminished. But his counsel did attempt to get records from that hospital, and Mexican law does not So it's possible they didn't even have them. And second of all, they won't give them to anyone who is not the person who received treatment, their close family member, or a member of the Mexican government. Now, Felipe's story has been consistent on all material points for the past six years, and he was found credible by four different individuals who evaluated his claims. In 2013, he was found credible by an asylum officer. That same year, on these same facts, he was found credible by an IJ. And then fast forward to 2014, he tells the same story. Another asylum officer found him credible, and in 2015, an IJ found him credible again. This IJ is the only adjudicator in the past six years on these facts that has determined Wasn't part of the adverse credibility based on that the government produced transcripts from the prior hearings and said, now you're telling a different story? I mean, you know, if you tell a story enough times and there's inconsistencies, that can be a basis for adverse credibility. Well, Your Honor, the IJ based its determination in that instance on Am I correct that the government did produce a transcript of another proceedings and had the present IJ compare it to what he said previously? Yes, Your Honor, you are correct. Those prior transcripts are in the record, yes. And actually, if you look at those transcripts, the core story has remained the same. The fact that Felipe didn't name Dragon in prior proceedings when he was unrepresented is not a distinction that is material. It's immaterial because he's been saying again and again to everyone who will listen that he met someone in federal prison, that person introduced him to a corrupt police officer who asked him to run drugs, Felipe said no, and then he was beaten by that person and then later by a group of men affiliated with that person. You're about three minutes. Do you want to reserve the balance? I'll take one more minute, Your Honor. Okay. Thank you. Now, evidence in this record shows that if Felipe is deported to Mexico, he will end up in the NNEXO, in prison, or in a psychiatric institution. And that's not only because he's been there before, but it's also because the experts, all four of them in this case, stated that if Felipe is sent to Mexico, he is going to be homeless on the street because he doesn't have any family there and he can't easily get his medication and he's actively schizophrenic. And that is going to make him vulnerable to be sent to places like an NNEXO, like a psychiatric ward, where he loses all legal independence and he's subjected to non-consensual lobotomies, rape, and over-medication to the point that he can't move, being chained to a bed for days at a time indefinitely. Therefore, the remedy that this case supports is for this court to remand with instructions to grant deferral of removal under CAT. Thank you, Your Honors. Thank you. All right. We'll hear from the government. May it please the Court. This is Jeffrey Theis, appearing on behalf of the Attorney General. If the Court has any questions regarding the particularly serious crime issue, I'm more than willing to answer them, but it seems that the focus has been on the torture issue. Well, you argue, I think you, this particular petitioner has been in and out of the country and has had many hearings throughout the time. And I think that you argue res judicata, that I think some of the, I think, asylum and withholding or whatever were previously adjudicated. But where do you raise res judicata to the BIA? And do we even have jurisdiction to consider that argument that wasn't raised before the BIA? Well, it's not a res judicata argument in terms of the board should have been precluded from reviewing the issue itself, but that the issue has been before this court. So the petitioner, in the petition for review back in 2014, that was what was at issue. It was the particular serious crime issue as well as the cat claim. And the petitioner was removed to Mexico and abandoned the claim. So we were just pointing out to the Court that the petitioner has already had an opportunity for an adjudication of those issues before this Court, but chose not to pursue it. So, but the previous IJ found that the carjacking was a particularly serious crime because it was a crime of violence. Wouldn't that change in the law preclude the application of res judicata? If that was a limit of the immigration judge's decision, then yes. But the immigration judge went beyond that to actually, and the board in that case, the 2014 case, actually went beyond that and conducted the Francesco analysis and looked at the actual discretionary analysis because it was not, even if it was a crime of violence, it was not an aggravated felony that would have resulted in a five-year sentence. So it was not a per se, particularly serious crime. So the board in that case, back in 2014, actually did the analysis and found that based on the nature of the offense, the circumstances surrounding it, and the sentence in prose, that it was a particularly serious crime. So the issue regarding whether or not, under a Francesco analysis, this is a particularly serious crime was actually previously adjudicated by the board, and that was at the heart of the case that went back to this Court back in 2014. Do you want to discuss the adverse credibility finding? Whether I asked questions of counsel for the petitioner about exhaustion, and didn't the BIA decide these issues on the merits when it concluded that the IJ considered and rejected Avila's explanations for these discrepancies? Yes, Your Honor. So the board's decision is an attempt to limit the immigration judge's decision. So this is not a case where the board just wholesale says, we agree with the immigration judge's adverse credibility determination, period, end of statement, and then moves on. Here the board actually analyzed it, conceded that some of the issues the immigration judge had found to be inconsistent may not actually be relevant or be inconsistencies, but nevertheless pointed to three specific ones that they felt were sufficient to affirm the adverse credibility determination. So are we limited to those three? I mean, I think that the board has limited those three, and they found them to be sufficient, and that's the only three that the government is pursuing. So the remaining issues the immigration judge may have had, yet the board did not specifically adopt and affirm or discuss those issues. So they found that the three issues that they pointed to alone were sufficient to uphold the adverse credibility determination. Can you better explain to me about the tattoos? I think that there was discussion that some of his tattoos were, they were colorful, and that people, that everyone knows that in prison they don't get a full tattoo parlor with all the colors, and so the prison tats tend to be more black and blue, or as it were. What's the significance of that to his credibility, and was he given an opportunity to, was he confronted with that? I don't know that he was confronted with it, Your Honor. The significance would just be to the overall credibility, but even if we exclude that basis, I think the issue regarding the dragon, whether or not he was mentioned in the earlier proceedings, or whether he even exists at all, alone would be sufficient to uphold the adverse credibility determination, because this kind of is, you know, it undermines the entirety of his claim. If the person he's claiming responsibility for pretty much everything that's happened to him in Mexico, and who he fears if he returns, if that's inconsistent with his previous testimony, and if as his counsel to the board suggested, the dragon himself may not even exist, that calls into question the veracity of the petitioner's claim in general. Does that mean you're not relying on the tattoos? Is that what you're saying? In our brief, we just dropped a footnote and said that, you know, the board stated that the petitioner had not challenged that adequately on appeal, but it was actually, it was submitted on appeal in the renewed motion to remand, but the petitioner had not challenged that. But I think that the remaining issues that the petitioner didn't challenge, or the remaining basis for the adverse credibility determination are sufficient, even if the court were to exclude the issue with the tattoos. Well, I guess the color part of it, I've done a lot of criminals, so I know about prison tats and the whole thing, but was the significance of that, that he continued to be involved in gang activity when he was on the outside and he must have gotten those tattoos on the outside? Is that, because he seemed to, I think, paint a bit of a picture that his gang involvement was with his first imprisonment and then he stopped it, but then when he went back to prison, you know, I guess there could be an argument that you needed protection while you were in prison, but if he was getting tattoos showing he was a sereno or he was a Mexican mafia empathizer with the 13 or whatever, is that to show that he's just not telling the truth about his prison involvement? Or what is that? I don't know that the immigration judge thought that deeply into it. I think the immigration judge was more just, he didn't believe that the prison itself would have the ability to make these kind of tattoos. There was another inconsistency regarding if and when he actually joined the Serenos gang, so that was separate from the tattoo issue, but that was another basis that the board affirmed, and I don't believe that that one was really challenged by the petitioner in their opening brief. So it's your position then that without that, the prison tattoos, that the inconsistencies surrounding the identity of Dragon and his relationship to the Serenos gang, that those are sufficient to uphold the adverse credibility? Is that your position? It's the government's position, yes. Can you go into what the record shows about torture that has passed torture? Can you tell me what the record shows about that? Well, Your Honor, if the court affirms the adverse credibility determination, the remaining evidence in the record is simply insufficient to actually corroborate the petitioner's assertion of past torture. Most of the evidence that the petitioner relies on in their opening brief is based on his own recollections. It's not objective, independent evidence of torture. The only thing that is kind of a personalized issue is the petitioner's mother's affidavit, but that, again, does not actually indicate that he was tortured in the past in Mexico. So is your position then that you don't dispute that there's this objective evidence that he has head injuries? No, I mean, we do not dispute that the petitioner, something happened to the petitioner while he was in Mexico. But we don't know what those, you're saying, if you knock out his testimony. Yeah, we don't know who was responsible, what it was, or what happened. We know that the petitioner was injured in the head. We have medical records that affect. We have a diagnosis of schizophrenia. But as far as what actually happened in Mexico, we don't have anything independent to corroborate the petitioner's allegations. Turning to the issue of future harm, the record is simply insufficient to demonstrate that it is more likely than not that the petitioner would face torture if he returns to Mexico. The petitioner's claim is essentially, you know, two and a half kind of issues. One is that because of his gang tattoos, that he would be subjected to torture. But the evidence pointed to by the petitioner simply does not show that it is more likely than not that he will be subjected to torture if he returns. The other issues are relating to his schizophrenia. He argues that if he returns to Mexico, he won't be able to access his medication. And if he can't do that, he'll either start doing drugs or become violent. And if he does that, then he would come to the attention of the authorities. If he does that, then he would be placed either in a rehabilitation facility or a mental institution. But the petitioner has not shown that each step in that hypothetical chain of events is more likely than not to occur. First, as far as the mental health facility, the petitioner has never been placed in one in the past. The petitioner relies on his expert testimony that says, you know, this is something that would happen. But, you know, that's kind of belied by the fact that the petitioner himself, from his own experience, has never been subjected to that while in Mexico. As far as the rehabilitation facility, all we have here is reminder evidence that he was placed in a rehabilitation facility. But no indication that he was or would face torture if he's in such a facility. If there are any further questions. We do not have additional questions. Thank you. All right, we'll go back to the petitioner. You have one minute and 53 seconds. Thank you, Your Honors. I'd like to respond to two points that the government has made here. One, Felipe was tortured in an XO. The letter from his mother indicates that Felipe was made to work all night without pay. He was made to clean a sewer of fecal matter in his bare feet. He was beat and doused in cold water and left in an isolation room without food. Now... Counsel, how does his mother know that? Because she went to visit him and he told her that. But if... You know, that's the challenge is if he's had an adverse credibility determination. Assume for a second that the adverse credibility determination is correct. Then wouldn't that taint his mother's testimony of what she learned from him? Well, Your Honor... No, because his mother was there with him in person. She observed the armed guards that wouldn't let him leave. He had no benefit to lie to his mother who went to visit him there. There's no... There's... There's just no reason for him to tell her anything different. So, frankly, the declaration is an indication of his candor that he's in this situation. She sees him there. She's there. He told her the truth. And that was what was happening to him. We can't ignore record evidence that objectively supports Felipe's story. And the second issue that I want to address is that Felipe is going to be subjected to torture because of his schizophrenia, because he will be behaving erratically on the street. And every expert in this case said that the government will target him as a result. Not because he would be doing drugs and drinking. That is a misconstruing of our argument. Thank you, Your Honor. All right. Thank you both for your argument. This matter will stand submitted.
judges: McKEOWN, CALLAHAN, VANDYKE